BARNS, Justice.
Of course these appeals can be affirmed1 without opinion but since the cases were initially assigned to me for proposed disposition and as there is involved a substantial controversy, it seems a statement of the-reasons for our decision is consistent with, our duty.
The appellant-plaintiff, Jacob Omwake,. brought two suits in equity for declaratory decrees and relief concerning the title to-real property of which he claimed to 'be-the owner, alleging that the defendant,. •Marjorie Omwake, was his wife and that she had caused his name to be forged to-warranty deeds purporting to convey the property, one portion to the Robinsons andL *567 another portion to the Dicksons, each of whom in turn had given mortgages to the defendant insurance company. The Chancellor rendered final decrees for the defendants and hence these appeals by the plaintiff.
Facts
Jacob B. Omwake and Marjorie Omwake were first married February 23, 1942, and thereafter plaintiff entered into a contract for .deed with Joos for the purchase of the property here involved. At that time, plaintiff was employed and his wife was working. They moved onto this property and plaintiff started building a house. In September, 1947, at which time they had one child, Marjorie Omwake, divorced plaintiff. At this time .the house was not completed. She was awarded custody of the child and support money.
On October 8, 1947, Marjorie Omwake married Samuel LaPrelle and LaPrelle moved in with her on the property. Plaintiff stopped paying her alimony and in settlement, on November 12, 1947, endorsed on the back of the contract for deed from Joos to Omwake an assignment of said contract to Marjorie. Jacob states that in the event of a sale she was to turn part of the proceeds,over to him and keep the balance. Mrs. Omwake and LaPrelle lived on this property from the time of their marriage until it was sold to the defendants. La-Prelle 'finished the inside of the house, put a roof on it and a porch. Plaintiff was their guest for several weeks and saw the improvements being made by LaPrelle.
Plaintiff urged Marjorie Omwake to leave LaPrelle, divorce him, and go with plaintiff to California. The plan was to sell the house that LaPrelle had put his money into. While LaPrelle was on a business trip to Miami she divorced him without his knowledge, and did not tell him of it upon his return. The divorce was granted March 30, 1948, in Bradford County.
Shortly after this divorce she placed the property in the hands of a real estate broker for sale and left the contract with him as evidence of her ownership. After Jacob’s return from California and without the knowledge of Marjorie, he secured .possession of the contract from this broker, crossed through the assignment and wrote “avoid” over it. Marjorie found out about this, and Jacob told her he had merely taken it to get it recorded in her name to protect her. He did not record the assignment but used the contract to get a deed to himself from Joos and a loan from 'Gulf Life Insurance Co.
On July 26, 1949, unaware of the divorce and subsequent developments, LaPrelle secured a building permit to build a concrete block house on the property and started building same. In August, 1949, plaintiff and Marjorie Omwake were secretly remarried. When he encouraged Marjorie to continue to live with LaPrelle and to encourage him to continue his work on the concrete block house, Omwake had told La-Prelle he would borrow money on other property he owned to help them with the improvements for the alimony he was supposed to pay Mrs. Omwake, but instead he placed a mortgage with Gulf Life Insurance Company on this same property.
Plaintiff authorized Marjorie to sell the porperty and she listed the property for sale. .About a week or ten days before the lots were sold, plaintiff gave Mrs. Omwake two blank deeds, signed by him, to use in consummating the sale. During this week or ten days before the lots were sold she visited him repeatedly at his rooming house. They planned, after the sale, to leave Jacksonville and go to Seattle, then to Alaska. She was to quit LaPrelle and follow him to Seattle. She had a truck to sell before leaving. .She was going to bring the children but he, who was going to drive up right after the sale, would take the children’s toys.
Mrs. Black, the realtor, found the defendants, Dickson and Robinson, as buyers. Mrs. Omwake says plaintiff went with her to Mrs. Black’s office and picked up $300, part of the binder payment. Mrs. Omwake gave the blank deeds to Mrs. Black to use in closing the sale, and told the Dicksons and Robinsons she had these deeds from her husband.
*568 On March 12, 1951, the sales were closed in the office of 'Burton Bryan, an attorney, Mr. Omwake did not come with Mrs. Om-wake and it was necessary for her to go get him because Bryan refused to use the two deeds signed in blank by Jacob. A man was identified as Mr. Omwake and he and Mrs. Omwake executed deeds and the two told him they were going to Alaska. He gave them a check for the proceeds, after deducting sums to satisfy liens and expenses, and the next day Mrs. Omwake came back to his office and asked him1 to identify her at the bank so she could cash the check, which he did. Mrs. Omwake testified that she went and got Mr. Omwake and brought him back to Mr. Bryan’s office, where he signed the deeds. She says plaintiff went with her to the bank the next day, March 14, 1951, to get the check cashed and the money. These facts are denied by Jacob. She says she took the children’s toys by plaintiff’s place and he packed them in his car; that they then went to the terminal station-to get some traveller’s checks. She says they divided the proceeds of the sale, with her getting $1,000 and the plaintiff $500 (denied by Jacob), and he bought traveller’s checks at the station with this money. Bryan testified that the man who signed the deeds as Jacob Omwake was not the plaintiff.
Plaintiff testified that his wife brought some of the children’s toys by his place and he packed them; that they went down to the terminal station to get some traveller’s checks; that she offered him some travel-ler’s checks she had but he declined them, saying she might need the money; that he bought $500 worth of traveller’s checks at the station at that time; that they had dinner together and he left for Seattle that same evening, (the day that the check was cashed).
Mrs. Omwake left about a week later in her truck for Alaska with -LaPrelle where LaPrelle found a job, and she and,LaPrelle are still living there with the children. However, the plaintiff was not through with her. He got a job in Seattle ánd visited her two or three times in Alaska. Marjorie testified that he proposed that she continue living with LaPrelle and get as-much money as she could from him, but to persuade LaPrelle to let her come to Seattle in the winter on the ground the weather was too cold in Alaska for the children;. that plaintiff would live with her in the-winter, without LaPrelle’s knowledge, and: she would live with LaPrelle in the summer. This she refused to do. Thereupon, Jacob changed courses.
Jacob returned to Florida and brought these suits against these defendants to set aside the deeds. The defendants, Dickson and Roibinson, occupied the property they bought and the first they heard of plaintiff claiming his name had been forged to the deeds was in August, 1951, when he came back to Florida. These suits were filed September 6th, 1951.
Conclusions
At common law, a married woman had no separate existence, became one with ’her husband, and her existence was merged in his so far as concerns of business and property. To mitigate the hardships of the common law rights of the husband in the wife’s property the equity-courts at an early date recognized the doctrine that a separate equitable estate might be created for the wife, that the husband could act as trustee, and the rules for its control would be governed by the principles of equity. If at the time of marriage, the wife was seized of land in fee, the husband thereupon became seized thereof jure uxo-ris and was entitled to the rents and profits therefrom in his own right. These rights in the husband continued only during cov-erture and were terminated upon the death of either spouse or in event of divorce. Blood v. Hunt, 97 Fla. 551, 121 So. 886.
At common law the wife’s land was conveyed by the levy of a fine and the plaintiff was permitted to recover in a collusive suit against the wife, alleging a fictitious sale by her. In the suit the wife was examined privately by the court or an officer thereof so as to overcome the presumption that the wife was likely to be acting *569 under the duress or compulsion of her husband’s authority and influence. Her rights in the land were barred if the judgment in the suit was against her. Blood v. Hunt, supra, 2 Minor’s Inst. 150.
The statutory acknowledgment for conveyances of the separate property of a' married woman was a substitute for the judicial proceedings of fine and recovery used for such purposes at common , law. Newman v. Equitable Life Assurance Society, 119 Fla. 641, 160 So. 745, but now that necessity in 'conveying' has been dispensed with for all purposes. F.S. § 693.-03, F.S.A.'
Since the Acts of February 4, 1835 and March 6, 1845, the rights of the wife to her separate property have been recognized and established by law which have eliminated the freehold estate jure uxoris of the. husband in the wife’s lands, and the present Constitution, like previous Constitutions, provides that property “of a wife owned by her before marriage, or lawfully acquired afterward * * * shall be her separate property * * Section 1, Article XI, of the Constitution, F.S.A.
Relating to the conveyances of the separate property of the wife F.S. § 708.04, F. S.A. requires that “the husband ánd wife shall join in all sales, transfers and conveyances of the property of the wife”. No particular manner of joinder is specified by this section and whether permitted by a separate deed has not been adjudged. Section 708.08 authorized the wife to sell, convey, transfer, etc. “ * * * her property, real and personal, * * * provided, however, that no deed * * * conveying * * * 'real property owned by a married woman shall be valid without the joinder of her husband * * * ”. This section relating to her legal title seems to' prescribe that the joinder shall be in the same deed. See also F.S. § 693.01, F.S.A.
The legal title to the land in question was not-vested in’the wife; in law it was not “owned by a married woman”, but by the husband and except for the trust in equity would be subject to the dower of a wife. . F.S. § 693.02, F.S.A. provides that “any married woman having a right of dower in any real property may relinquish it by joining in the conveyance or mortgage thereof, or by a separate instrument without the joinder of /her husband * *
The purpose of the Statutes, requiring the husband to join the wife in the transfer o.f the land of the wife is primarily for the protective benefit to the wife and secondarily, for the welfare of the husband, since he is responsible for her care and support, by preventing the wife, without his consent, from depreciating the value of her separate property and by. preventing the wife from conveying when it would be detrimental to the welfare of their mutual marital interest.
A finding of the Master was that the appellant was fully apprised of all the facts and circumstances of /both transactions and instead of repudiating them, ratified them. The plaintiff is now estopped to repudiate the deeds of conveyance to the purchasers. In case of Johnson v. Elliott, 1912, 64 Fla. 318, 59 So. 944, a wife joined with her husband in a deed to F. S. Gay which deed was not accepted whereupon another deed was executed by the husband and the son to F. S. Gay & Bros, of which the wife was subsequently informed. She had agreed to sell the land and used some of the proceeds of the purchase price. The Court held that the wife was estopped notwithstanding the- statute requiring -joinder of husband and wife and- separate acknowledgment of the wife.
When Jacob procured a deed to himself ás the original vendee instead of t.o his ex-wife, Marjorie to whom he had assigned his interest he became a trustee of a constructive trust, ex 'maleficio, for his wife, Marjorie,' and the Statute of Uses, F.S. § 689.09, F.S.Á. will not execute the trust but' equity may.
Omwake. held the legal title charged, in equity, with .a trust and though the Statute of Uses will not execute a constructive trust, equity will in this instance. Although the facts established raise doubt *570 as to whether she is in fact the wife of Omwake or LaPrelle, it is of no consequence in this case. If Marjorie is the wife of Omwake then the estoppel applies to him. If she is the wife of LaPrelle it is of no consequence since the legal title was not vested in Marjorie or LaPrelle. The final decree was sufficient to confirm the conveyance or operate as a conveyance (see 31 F.S.A. Equity Rule 67), thereby executing the trust and making good her representations to the purchasers.
The decree appealed is affirmed.
ROBERTS, C. J., and TERRELL, SE-BRING and MATHEWS, JJ., concur.
TPIOMAS, J., agrees to conclusion.
DREW, J., agrees to conclusion, and judgment of affirmance.